IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 6, 2012

## ALBERT EVANS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 03-02257 W. Mark Ward, Judge**

_____

**No. W2011-00366-CCA-R3-PC - Filed August 20, 2012**

_____

The Petitioner, Albert Evans, appeals from the Shelby County Criminal Court's denial of post-conviction relief from his convictions for first degree murder and especially aggravated robbery, for which he is serving life without the possibility of parole plus twenty-four years. On appeal, the Petitioner contends that he did not receive the effective assistance of counsel. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Sean H. Muizers (on appeal) and Eran Julian (at post-conviction hearing), Memphis, Tennessee, for the appellant, Albert Evans.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Marlinee Iverson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This court summarized the trial evidence in the Petitioner's appeal of his convictions as follows:

> On November 1, 2002, the severely beaten and stabbed body of the victim, Damon Johnson, was discovered underneath a mattress next to a dumpster at his ex-girlfriend's Memphis apartment complex. Subsequently, the defendant was arrested

and indicted for murder in the perpetration of especially aggravated robbery, first degree premeditated murder, and especially aggravated robbery.

. . .

The victim's mother, Doris Johnson, testified that the victim was twenty-five years old when he died and left behind a wife and a young son.

Lashonda Brown[1] testified that, in October 2002, she was living at Barron Brook Apartments in Shelby County with her children and her sisters, Shazelle Evans and Larhonda Brown. Also living with the family were Lashonda's boyfriend, Dedrick Lewis, and Shazelle's husband, the defendant, who lived "there during the weekend." Lashonda testified that on October 28, 2002, "between 8:30 and 9:15" p.m., the victim, her ex-boyfriend, came to her apartment. The victim arrived in a "gray Taurus" and "was upset" over an argument he had with his wife. Lashonda said her sisters, Lewis, the defendant, and three children were at the apartment when the victim arrived. After staying for approximately twenty minutes, the victim left but returned at "maybe almost [around] 12 midnight," driving his white Nova.

Approximately twenty to thirty minutes after arriving for his second visit, the victim took Lashonda and her baby to a gas station and a doughnut shop. About an hour later, the trio returned to the apartment where Lashonda took the baby upstairs while the victim waited at his car.[2] As she was walking back downstairs to return to the victim, Lashonda saw the defendant "hit [the victim] in the back of the head with an iron bat." The

---

[1]Because witnesses Lashonda Brown and Larhonda Brown share the same first initial and last name, we will utilize their first names in referring to them. We intend no disrespect by this procedure but do so to avoid continually repeating the full names of the witnesses.

[2]Lashonda lived in an upstairs apartment, the steps to which were outside the building.

victim "was in a daze" and "rolled over on the ground." Lashonda watched as the defendant hit the victim "again upside his head . . . four times in a row." She testified that there were "lumps in the top of [the victim's] head, and it was just full of blood there." Asked if the victim tried to do anything to the defendant, Lashonda said, "No," explaining that the victim "tried to . . . stand up. But when he did, his head hit the wall. It hit the . . . bricks on the wall." After the victim hit the wall, he fell again and "couldn't come out of that." She said she did not call the police about the beating because she was scared.

Lashonda identified a photograph of the victim's "white Nova" that he drove to her apartment that night and the victim's blue zipper jacket which had the words "Dirty South School of Hard Knocks" on it. She said she was with the victim when he purchased the jacket and did not know of the defendant ever owning such a jacket. She also identified a necklace as "the necklace [the victim] had around his neck . . . the last night that [she] seen him." She was with the victim when he purchased this necklace, which had a pendant on it, but said she did not recognize the pendant as the victim's.[3] On cross-examination, Lashonda testified that the bat the defendant used to hit the victim belonged to Larhonda, who kept it in the trunk of her car.

Shazelle Evans,[4] the defendant's wife, testified that in October 2002, she and the defendant had been separated "[f]or about a year." She explained that the defendant came to her apartment "[m]ainly on the weekends" and that he had a girlfriend, Gladys Mitchell, with whom he lived "Monday through Friday." The defendant did not keep any of his clothes at her apartment. Shazelle said that the victim came to her

_____

[3]At this point, the trial court admitted the necklace and pendant into evidence "conditioned upon the State calling a necessary witness to ID it later."

[4]Because witnesses Shazelle Evans and Delores Evans share the same last name, we will utilize their first names in referring to them. We intend no disrespect by this procedure but do so to avoid continually repeating the full names of the witnesses.

apartment at "about 12 a.m." on October 28, 2002. After Lashonda and the victim left "to go get doughnuts," the defendant told Shazelle that "he was going to rob Little D," which was the victim's name. She testified that the defendant was no longer inside the apartment when her sister came home. Shazelle said when Lashonda "came up the first time, she brought the baby in the house, but the second time she came, she was jumping and hollering and screaming" that the defendant had "hit [the victim] with a bat." The next morning, the defendant returned to Shazelle's apartment and showed her "a silver chain" but did not tell her from where he had gotten it. Shazelle said she had seen the victim's necklace before but said it was not the necklace the defendant showed her that morning.

On cross-examination, Shazelle testified the defendant came to her apartment between 3:00 and 5:00 p.m. on October 28, 2002, and did not leave "[u]ntil about 2:30 that morning." She said that he left the apartment sometime that evening for "[p]robably like about 20, 30 minutes" and was not in the apartment when Lashonda returned from the store with the victim. On redirect examination, Shazelle acknowledged that she told the police that, the morning after the victim was beaten, the defendant "told [her] he took a silver link chain and a watch and a little plastic red light flashing thing" from the victim.

Larhonda Brown testified that on the night the victim was attacked, Lashonda came in the apartment repeatedly screaming that "[t]hey beat him," saying that "[the defendant] hit [the victim] across the head with a bat." Larhonda recalled the defendant coming back inside the apartment that night and retrieving what "looked like a Ginsu knife," which he never returned, from the kitchen. She said the defendant "threatened" them that "if anybody said anything [to the police], he was going to hurt someone."

Larhonda testified that she kept an "iron bat" in the trunk of her car, to which no one else had access, but she kept a set of keys "in the table" and "another [set] was in the door." She

acknowledged that the defendant could have gotten inside her car "[b]y the keys being in the door."

Gladys Mitchell, the defendant's girlfriend, testified that the defendant stayed with her "three or four times a week" and kept his clothes at her house. Mitchell said that on the night of October 28, 2002, the defendant "came over about 12:30" driving "[a] little old beige or a cream color white car," saying that it belonged to "a friend." After Mitchell told the defendant "[t]o get that piece of shit out of [her] yard," the defendant moved the car. Mitchell acknowledged telling the police that the defendant said the car was "hot" and that "he parked it on Kimball in front of a vacant house across the street from the tattoo shop." She said the defendant was wearing "a light blue jacket" that looked like the jacket Lashonda identified as belonging to the victim. Mitchell had never seen the defendant wear the jacket before and when she asked him whose jacket it was, he told her it was none of her business. After this conversation, the defendant left and did not return until "[a]bout 3 or 3:30."

Mitchell identified a photograph of the victim's car that she was shown by police on November 4, 2002, and on which she wrote "[l]ook [sic] like the car I saw [the defendant] in and pushing out of driveway and into the street." She also identified a photograph of the victim's blue "Dirty South" jacket shown to her by the police on November 2, 2002, explaining that it was "[t]he jacket [the defendant] had on that night."

The victim's mother, Doris Johnson, was recalled to the witness stand by the State. She identified the victim's necklace, identified by prior witnesses, Lashonda and Shazelle, as the victim's. Johnson also recognized the pendant as the victim's, explaining that the victim wore the necklace and pendant together "[a]ll the time."

Bobby Montgomery testified that in October 2002, he worked at Cash America Pawn as an assistant pawn broker. He said that on October 29, 2002, the defendant pawned "a pendant charm, a cross." Montgomery identified a pawn ticket that

described the pendant and contained the defendant's personal information, signature, and thumbprint. Shown the victim's necklace and pendant, Montgomery identified the pendant as the one "pawned by [the defendant]." He did not recall the necklace being with the pendant and explained that he remembered the cross pendant "because of the . . . two-toneness of the item. . . . [I]t was a unique piece."

Deborah Howard-Hooker, a fingerprint technician with the Shelby County Sheriff's Department, testified that she compared the thumbprint on the pawn ticket to the defendant's thumbprint and concluded that the print on the pawn ticket was the defendant's.

Alfred Jones, Jr. testified that at approximately 6:30 a.m. on November 1, 2002, he found the victim's body underneath a mattress by the dumpster at the Barron Brook Apartments. Jones "picked [the mattress] up and peeked at it under" and saw the victim on his back with his "throat cut." He informed a police officer near the apartment of his discovery.

Officer Aaron Frazier of the Memphis Police Department testified that after being flagged down by Alfred Jones, he located the victim's body underneath a mattress, saying that the victim was wearing boxer shorts and had several wounds "around the skull and . . . also on his neck." Sergeant Troy Berry of the Memphis Police Department testified that on November 1, 2002, he was assigned to the crime scene division and responded to the Barron Brook Apartments to take photographs of the crime scene. Berry said that the victim had "[g]ray duc[t] tape" on both arms "[j]ust above the wrists."

Officer Marcus Berryman of the Memphis Police Department Homicide Bureau testified that on November 2, 2002, he went to Cash America Pawnshop "looking for information on a pendant. A cross pendant." Berryman retrieved the defendant's pawn ticket from the shop, but the pendant was not located. He subsequently went to Gladys Mitchell's house and ultimately to the house next door to Mitchell's, where "Renee" lived. At that house, Berryman

found the victim's Dirty South jacket, necklace, and cross pendant in a bedroom. The necklace and pendant were "located in the top right dresser draw[er]" and were attached to each other.

Officer Timothy Wayne Cooper of the Memphis Police Department's Crime Response Unit identified photographs he made of the crime scene on November 3, 2002, including a photograph of the "breezeway area just east of 3000 Barron," where Lashonda Brown's apartment was located. Blood was found on the brick wall of the breezeway and "a large pool of blood" was found on the ground next to the brick wall. Officer Mary Pickens of the Memphis Police Department's Crime Scene Unit testified that on November 1, 2002, she was called to a vacant house on Kimball to investigate a homicide and identified photographs she took of the victim's car, an "Olds Omega, white in color."[5] Pickens also collected "a red piece of carpet" and red "[s]mall fibers that were taken by the trunk keyhole."

Dr. Teresa Campbell, a Shelby County assistant medical examiner, testified that she performed the autopsy of the victim's body which revealed "numerous lacerations to the top of the head, to the forehead, to the eye area. Lacerations and contusions or bruises were seen on the face." The victim also had "an incision or cut to the back of the head near the neck[,] [s]everal incisions actually" and a laceration "on the left forehead caused by blunt trauma" which "was rather deep, went to the bone. And there was a skull fracture beneath this laceration." Dr. Campbell testified that although the lacerations on the victim's head "certainly could [have been caused by] a bat," she could not "rule out other objects either." On the victim's neck was "an incised wound that went all the away across" but "did not extend deeply to vital structures such as the

---

[5]The "Olds Omega" car photographed by Officer Pickens is the same "white Nova" car Lashonda Brown identified as the victim's and the same car Gladys Mitchell identified to the police as the one the defendant drove to her house the night the victim was killed.

-7-

carotid arteries." The incised wound "did get the right external jugular [vein]" on the right side of the victim's neck.

In addition, the victim had the following injuries, according to Dr. Campbell: "multiple flick or drag marks" on his chest, a "knife stab wound to the lower chest . . . that penetrated into the liver," "several stab wounds" on his back right shoulder, a "stab wound to the right side of the back," abrasions on his lower back, "a bruise or contusion to the top of the right shoulder," and "multiple contusions and abrasions" on his arms and legs. The victim had "duc[t] tape wrapped around the forearms, both forearms. But [his] arms were not tied together." Dr. Campbell testified that the victim "had some yellow abrasions to his skin in the lower extremities indicating scraping of the skin after death because there was no bleeding into it so it looked yellow." She also identified "defensive wounds" on the victim's hands and said that "red fibers [were] recovered from [the victim's] hair, the top of his head." The cause of the victim's death was multiple injuries that included "the blunt trauma to the head, the incised wounds of the neck, and stab wounds to the abdomen."

Qadriyyah Debnam, a forensic scientist with the Tennessee Bureau of Investigation Memphis Crime Laboratory, testified that DNA tests of the blood located on the brick wall of the Barron Brook Apartments matched the victim's DNA. Debnam also said the carpet recovered from the trunk of the victim's car tested positive for human blood, but she was unable to get a DNA profile from this blood to match it to the victim. Linda Littlejohn, a microanalyst with the Tennessee Bureau of Investigation Crime Laboratory, testified that her analysis of the red fibers from the victim's head, the red fibers from the trunk keyhole of the victim's car, and the red carpet from the victim's trunk revealed that they were all consistent with each other.

The defendant elected not to testify and rested his case without presenting any proof.

The jury found the Petitioner guilty of first degree premeditated murder, first degree felony murder, and especially aggravated robbery. In the sentencing phase of the trial, the jury

found three statutory aggravating circumstances and sentenced him to serve life without the possibility of parole. The trial court merged the murder convictions and ordered that the Petitioner serve his twenty-four year sentence for the robbery conviction consecutively to the sentence for the murder. The Petitioner's appeal to this court was unsuccessful. State v. Albert Evans, No. W2005-00161-CCA-R3-CD, Shelby County (Tenn. Crim. App. May 17, 2006), perm. app. denied (Tenn. Oct. 16, 2006). The Petitioner then filed his petition for post-conviction relief.

At the post-conviction hearing, the Petitioner testified that two attorneys were appointed to represent him in the conviction proceedings. He said that trial counsel visited him in jail, that they discussed the case, and that to his knowledge, counsel investigated the case with the assistance of an investigator. He said he felt good about counsel's representation until a point at which certain evidence was admitted, after which counsel seemed to lose concern for the Petitioner and the Petitioner lost confidence in counsel. He thought counsel should have asked the witnesses more questions.

The Petitioner testified that the victim's mother sat in the courtroom during the testimony of three witnesses and later testified as a "rebuttal" witness[6] about a necklace and pendant that belonged to the victim. There was evidence the Petitioner pawned the necklace, but no evidence connected the pendant to the Petitioner. He said that trial counsel stood up and said something to the judge after the testimony but that nothing was done. He thought trial counsel could have said more during closing argument. He said counsel appeared to feel unwell or to have elevated blood pressure, which he thought had an effect on the trial.

On cross-examination, the Petitioner acknowledged that his main concern was with the testimony about the necklace and pendant. He said that before the victim's mother's "rebuttal" testimony, the necklace had been identified by the victim's girlfriend. On redirect examination, he said that the victim's mother was a witness for the State, that she heard the testimony of three other witnesses, and that she was recalled as a rebuttal witness.

The transcript of the Petitioner's trial was received as an exhibit. It reflects that the victim's mother was the first State's witness. She identified a photograph of the victim and provided information about his surviving relatives. Lashonda Brown, Larhonda Brown, Shazell Evans, Gladys Mitchell, and a police officer testified. The State then recalled the victim's mother in its case-in-chief. She identified herself by name and as a previous witness, identified the necklace and pendant as the victim's, and said she always saw him

_____

[6]The victim's mother testified twice during the State's case-in-chief. The Petitioner did not present evidence during the guilt phase of his trial, and there was no rebuttal proof.

wearing the items when he came to her house. Her testimony covered less than two pages of the transcript. Trial counsel did not cross-examine her. As the next witness was called but before he testified, trial counsel objected at the bench to the victim's mother's testimony because she had been in the courtroom despite the rule of sequestration having been invoked. See Tenn. R. Evid. 615 (regarding sequestration of trial witnesses). Counsel said, "I wasn't expecting her to come back up." The court denied trial counsel's request for a curative instruction. During a jury break later that day, trial counsel moved for a mistrial. With respect to his actions when the witness was recalled, he stated:

> [I]t hadn't been 15 minutes before I'd spoken with the State outside, and I was told – I was given an order of proof yesterday and was told that there would be no deviation with that other than . . . [a police officer] who was to testify first. I say 15 minutes. It may have been more like a half an hour. But before we started trial today, I made it a point to ask about that.
>
> When Ms. Johnson was called, I initially was – the name sounded familiar, but I didn't recognize her. She's changed her hair. She has something different on today. I didn't recognize her at first.
>
> And when she took the stand, I was concentrating on . . . the evidence that was being put on at the time, and it didn't even hit me until after she had just gotten off the stand . . . what had happened. And at the same time, I'm not 100 percent sure she's been in the courtroom. I just noticed that during breaks I would stand up, and I've seen her walk out before.

Defense counsel conducted a voir dire of the victim's mother. She stated that she was present during some of the previous testimony. She recalled "the younger girl" but did not know how many of the witnesses she heard testify because she left the courtroom when one of the witnesses described the victim being hit with a bat. She said that when she arrived at court that morning, she was shown the necklace and told she might be called as a witness to identify it. The court denied the motion for a mistrial, finding that the victim's mother did not alter her testimony to conform with that of another witness and stating that it would have allowed her to testify, even if a timely objection had been made.

The transcript of the closing argument reflects that trial counsel attempted to convince the jury that Dedrick Lewis committed the crime because he was jealous of the victim's relationship with Lashonda Brown and that Shazell Evans, Lashonda Brown, and Larhonda

Brown, all sisters, were not truthful in their testimony because they were trying to protect themselves and possibly Mr. Lewis. He argued that the victim was brutally murdered by someone who was angry and in a state of passion, rather than someone who was trying to steal a jacket or a "trinket," but that the proof showed that the victim and the Petitioner "never spoke a cross word with each other." He noted that Lashonda Brown's testimony about seeing the victim being beaten from behind was inconsistent with the medical examiner's testimony that the devastating blow came from in front of the victim. He noted other inconsistencies between Lashonda Brown's testimony and the physical evidence and in the testimony about the necklace and pendant. He argued that the Petitioner's girlfriend's testimony linking the Petitioner with the victim's jacket was not credible because she had mental and physical problems.

Trial counsel testified at the post-conviction hearing that the Petitioner had no viable defense to the crimes. He noted that the Petitioner's friends and relatives testified against him, that physical evidence tied the Petitioner to the crimes, and that the Petitioner was seen driving the victim's car. He said there was no basis for arguing self-defense, conspiracy, or that there was another perpetrator. All he could do was make the State prove its case. He said, however, that an alternative theory came to him on the last day of the trial. He did not know what Lashonda Brown would have said had he asked her if she disposed of the bat used in the crimes.

Trial counsel testified that the victim's mother was the State's first witness. He said "the rule" for exclusion of witnesses from the courtroom had been invoked and that the victim's mother remained in the courtroom after her testimony. He said that Shazell Evans, Larhonda Brown, and Lashonda Brown testified next. One of these witnesses could identify the pendant but not the necklace, one could identify the necklace but not the pendant, and he could not recall the other witness's testimony. He said the State was allowed to admit the evidence for identification only.

Trial counsel testified that the victim's mother was a very well-dressed witness at the beginning of the trial but that he did not recognize her when she was recalled because she was wearing sweat pants, house shoes, and a t-shirt and not wearing a hat. He said that by the time he recognized her, she had already testified about the necklace. He said her testimony connected the necklace and the pendant and allowed the State to have both items admitted as exhibits. He objected, but the judge said he could not "unring the bell." He said that on the day the victim's mother was recalled, the prosecutor gave him an updated witness list and told him that one police officer had been substituted for another officer on the list. He noted that the witness had a common last name, Johnson, and that he was looking for Officer Johnson on the witness list when she was first called. Earlier that day, he saw the

prosecutor take the necklace into the hall and suspected the prosecutor showed it to the witness to see if she could identify it. He said the failure to object was an honest mistake.

Trial counsel testified that he felt sick when he realized he had no viable defense. He said it was the first time he had ever been in that position. He agreed with the appellate court that a rational trier of fact could have found the Petitioner guilty even absent the evidence about the pendant.

On examination by the court, trial counsel testified that he and the prosecutor had a handshake agreement for the prosecutor to provide him with the order of the proof. He said that on the day the victim's mother was recalled, he had asked the prosecutor that morning if there were changes and that the prosecutor told him "they were going to swap police officers, but that the names had remained the same so they might not be in order." He said that he thought the fact witnesses had testified by this point and that the only remaining witnesses would be police officers. He said the victim's mother's rebuttal testimony was so brief that he was still looking through the witness list for her name by the time she finished testifying.

On cross-examination, trial counsel conceded that Lashonda Brown's testimony could have been interpreted to suggest illegal activity by the victim. He did not think it would have hurt the defense had he asked Lashonda Brown about illegal activity, unless the question inflamed the jury because the victim could not have done anything to warrant the brutal way in which he was killed. He noted the evidence showed that the victim was beaten with a baseball bat, had his throat cut, was bound, had his pants removed, was taken behind a dumpster, and had "his face stood on with a mattress until he [quit] gurgling." He said it "sound[ed] right" that the victim was a drug dealer but thought that presenting evidence of the fact would have inflamed the jury. He said the defense was that the crime was one of passion, not a robbery, and that the witnesses conspired against the Petitioner. He conceded that the defense theory did not occur to him until the night before closing arguments. He said the medical examiner's testimony about there being "flick marks" indicating torture prompted his revelation of a defense theory. He said that it was possible that the victim's mother's testimony about the necklace and pendant could have affected the verdict, as "anything could have." He noted, however, that there was sufficient proof to convict the Petitioner aside from the evidence about the necklace and pendant.

The trial court filed a detailed order, in which it found that trial counsel's performance was deficient in failing to object timely to the recall of the victim's mother but that the Petitioner failed to establish prejudice from the lack of a timely objection. The court noted that the victim's mother might have been allowed to testify even if a timely objection had been made. It found, as well, that the evidence against the Petitioner was overwhelming and

that there was not a reasonable probability of a different result even if the evidence had been excluded. The court denied the petition.

On appeal, the Petitioner contends that trial counsel provided ineffective assistance by failing to object immediately when the victim's mother was recalled by the State. The State contends that the Petitioner failed to prove his claim. We agree with the State.

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2006).

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the Petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance fell below a reasonable standard is not enough because the Petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability means a "probability sufficient to undermine confidence in the outcome." Id.

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were "within the range of competence demanded of attorneys in criminal cases." Further, the court

stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir.1974), and United States v. DeCoster, 487 F.2d 1197, 1202–04 (D.C. Cir. 1973). Baxter, 523 S.W.2d at 936. Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. See DeCoster, 487 F.2d at 1201; Hellard, 629 S.W.2d at 9.

In the Petitioner's appeal of his convictions, this court ruled that the Petitioner waived review of the trial court's admission of the victim's mother's testimony by failing to interpose a timely objection. See Albert Evans, slip op. at 8. The record establishes that the witness was in the courtroom before she was recalled. Even though trial counsel did not recognize the witness on sight, he should have objected when the witness identified herself by name and as the victim's mother, which would have allowed the trial court to rule on the witness sequestration issue before her testimony about the necklace and pendant.

We conclude, though, that the Petitioner failed to establish prejudice. The trial court stated in the trial that it would have overruled a timely objection to the witness's testimony. Violation of Tennessee Rule of Evidence 615 regarding exclusion of witnesses from the courtroom does not require that the witness's testimony be excluded. See Tenn. R. Evid. 615; State v. Anthony, 836 S.W.2d 600, 605 (Tenn. Crim. App. 1992). Lashonda Brown testified that she recognized the necklace as the victim's, but not the pendant. Shazelle Evans testified that the necklace the Petitioner showed her was not the one she had seen the victim wear. Bobby Montgomery, an employee of a pawn shop, identified the Petitioner as the person who obtained a loan using the pendant as collateral on October 29, 2002. Officer Marcus Berryman testified that on November 2, 2002, he received a telephone tip to go to the Petitioner's girlfriend's address. After the Petitioner's girlfriend directed him next door, he found the victim's necklace with the pendant attached and the victim's jacket. Even if the victim's mother had not been allowed to testify that the necklace and the pendant were the victim's, other evidence established that the necklace was the victim's, that the pendant was attached to that necklace when it was found a few days after the Petitioner was seen beating the victim with a bat, and that the Petitioner used the pendant as collateral for a loan on the day after the beating. We conclude that the Petitioner was not prejudiced by trial counsel's failure to object to the victim's mother's testimony.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE